IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ARNULFO RAMOS RIOS,

      Plaintiff,

      v.

REX RAMAGE, et al.,

      Defendants.

Case No. 2:19-cv-02602-HLT

## MEMORANDUM AND ORDER

This is a negligence case arising out of a vehicle accident. Plaintiff Arnulfo Ramos Rios alleges that Defendant Rex Ramage, the driver of the truck that hit the vehicle Plaintiff was riding in, is liable for negligence.[1] Defendant has filed four motions to exclude expert testimony. Docs. 136, 139, 141, and 146. For the reasons discussed below, the Court grants Defendant's motion as to Walter Guntharp, denies without prejudice Defendant's motion as to Tim Krehbiel, grants Defendant's motion as to Santo Steven BiFulco with a limited exception, and denies Defendant's motion as to Robert Tremp.

I.     BACKGROUND[2]

This case arises out of an accident that occurred at approximately 5:20 p.m. on December 21, 2018. Defendant was driving a white 2014 Ford F-250 that collided with a black 1999 Ford F-250 driven by Bryce Sears. The accident occurred at the intersection of 28th Road and Avenue J, which is approximately 1.5 miles east of Little River, Kansas. Sears was westbound on Avenue J

---

[1]   At the same time the Court issued this ruling, it separately granted summary judgment in favor of ONEOK Services Company, Ramage's employer, on grounds that Ramage was not acting within the scope of his employment at the time of the accident. *See* Doc. 164. Although the *Daubert* motions were filed by Ramage and ONEOK collectively, Ramage is now the only remaining defendant.

[2]   The following facts are taken from the undisputed facts in the parties' recent summary-judgment motions. *See* Doc. 164.

and did not have a stop sign. Defendant was northbound on 28th Road and did have a stop sign at the intersection with Avenue J. Plaintiff was a passenger in Sears's truck and suffered injuries in the accident. Plaintiff asserts that Defendant negligently failed to yield. In support of his case, Plaintiff has designated the testimony of at least four experts.

Walter Guntharp claims expertise in the fields of commercial vehicle safety, operation, and compliance. He opines in his report that there were no obstructions to vision or lighting at the intersection where the accident occurred, that Defendant would have seen the vehicle Plaintiff was riding in had he followed requirements in the Kansas Driving Handbook to look both ways twice, that Defendant violated Kansas law by failing to yield, and that Defendant's failure to check the intersection properly caused the crash. *See generally* Doc. 140-2.

Tim Krehbiel has submitted a report offering two opinions: (1) that videos he made and photographs he took represent the lighting conditions at the time of the accident, and (2) that Sears's running lamps were on at the time of the accident. *See generally* Doc. 147-7.

Santo Steven BiFulco is a life-care planner who has provided a report that opines on Plaintiff's future medical costs. *See generally* Doc. 145-1.

Robert Tremp is a vocational expert who provided a vocational evaluation that concludes that Plaintiff, given his current condition, may now expect to earn minimum wage, "may need to work part-time," or may be unable to work at all. *See generally* Doc. 144-1.

Defendant seeks to exclude the testimony of all four experts. *See* Docs. 139, 146, 141, and 136, respectively.

## II.    STANDARD

Federal Rule of Evidence 702 governs expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 imposes upon the district court a "gatekeeping role" to ensure that expert testimony is both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 597 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

In performing this gatekeeping function, the "the district court generally must first determine whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (quoting Fed. R. Evid. 702). Second, if the expert is qualified, the court next determines if the expert's opinion is reliable under *Daubert*. *Id.* The burden is on the party offering the expert testimony to prove its admissibility. *Id.* "A district court has 'wide discretion' in determining whether a witness's experience is sufficient to qualify him as an expert." *Ronwin v. Bayer Corp.*, 332 F. App'x 508, 512-13 (10th Cir. 2009) (citation omitted).

## III.   ANALYSIS

### A.   Guntharp

Defendant challenges Guntharp's opinions (1) that there were no obstructions or low-lighting conditions that would have blocked Defendant's view of the approaching truck

("Conditions Opinion"), (2) that Defendant's failure to properly check before pulling into the intersection caused the accident ("Causation Opinion"), and (3) that Defendant violated Kansas law ("Traffic Rules Opinion"). Doc. 140 at 7.

Conditions Opinion. Guntharp's opinion on conditions encompasses two areas: obstructions to vision and lighting. Defendant argues that these are fact questions appropriate for fact witnesses and that Guntharp's opinion on the subject is not reliable. The Court agrees. Guntharp's Conditions Opinion is largely based on witness statements in the police report and a Google Earth image. He did not visit the scene. He merely repeats as expert opinion the statements of fact witnesses from the police report, which is not appropriate expert testimony. *See Hanan v. Crete Carrier Corp.*, 2020 WL 584370, at *3 (N.D. Tex. 2020) (excluding certain opinions of Guntharp that merely regurgitated factual information that could be presented to a jury through witness testimony). To the extent Guntharp relied on a Google Earth image for his opinion that the intersection and nearby roads were flat or level, *see* Doc. 140-3, the Court finds the opinion unreliable. The Google Earth image contains no information about elevation or topography and on its face reflects nothing but a one-dimensional image of two roads intersecting.

Guntharp's opinion that there was adequate lighting is only based on the time of day the accident occurred. It's unclear why expert testimony would be needed on this point, as the lighting just after sunset is within the understanding of lay witnesses and jurors, and eyewitnesses can testify to how light or dark it was. *See* Fed. R. Evid. 702(a) (defining expert testimony as encompassing an expert's "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue"); *see also Dahlberg v. MCT Transp., LLC*, 2012 WL 8945006, at *2 (D.N.M. 2012) ("In some instances, Mr. Guntharp's opinion states matters which would be obvious to the jury and his expert testimony is not required

to assist the jury to determine a fact in issue."); *Jones v. Beelman Truck Co.*, 2015 WL 3620651, at *7 (E.D. Mo. 2015) (excluding expert opinion regarding dirt on a headlamp based on a photograph because a "jury is as capable as [the expert] of viewing a photograph and noting the presence of dirt on the windshield and headlamps."). Guntharp testified that his opinions on lighting were based in part on his "many, many years of driving." Doc. 140-1 at 5. Surely most jurors have similar experience. He also specifically testified he was "not a conspicuity expert or lighting expert." *Id.* Nor did Guntharp visit the accident scene or measure any ambient lighting. *See Jones*, 2015 WL 3620651, at *6 (excluding conclusory lighting testimony as "fundamentally unsupported" in part because it was not based on any testing). Accordingly, the Court concludes Guntharp's Conditions Opinion is not reliable and would not help the jury understand or determine a fact in issue

Causation Opinion. Regarding the Causation Opinion, Defendant argues it is inadmissible because it was not based on any accident reconstruction and is impermissible ipse dixit. The Court agrees that Guntharp is unqualified to offer an opinion on the cause of the accident when he did no accident reconstruction. *See Dahlberg*, 2012 WL 8945006, at *3 (excluding certain opinions of Guntharp about driving and accident causation because "he is not a reconstructionist and the Court is not satisfied that he has the requisite, knowledge, skill, experience, training or education which would qualify him as an expert"); *Hanan*, 2020 WL 584370, at *3-4 (striking Guntharp opinions that touch on legal cause of crash). To the contrary, Guntharp testified to not knowing numerous variables that would have impacted the accident. *See* Doc. 140-1 at 9 ("no idea" how fast Sears was driving); 12 (did not measure any distances); 16 (not aware how much time passed from when Defendant entered intersection and accident); 17 (not aware how fast Defendant accelerated).

Rather, Guntharp's conclusion is that the cause of the accident was that Defendant failed to check for oncoming vehicles and entered the intersection when Sears was too close to avoid the collision. But he bases this finding on the fact that an accident occurred. Doc. 140-1 at 15. In other words, Guntharp is opining that the accident occurred because Defendant did not yield, and we know Defendant did not yield because the accident occurred. In considering a *Daubert* challenge, the Court must consider whether the proposed testimony is based on facts and data that sufficiently satisfy Rule 702. *Rodgers v. Beechcraft Corp.*, 759 F. App'x 646, 659 (10th Cir. 2018). The focus is on the method used, not the conclusions reached. *Id*. Here, Guntharp's opinion is entirely conclusory, and therefore his Causation Opinion must be excluded.

Defendant also takes issue with Guntharp's conclusion that "[h]ad Mr. Ramage acted in a safe, professional manner, this crash would not have occurred and Mr. Rios would not have been injured." *See* Doc. 140-2 at 5. Other courts have rejected nearly identical opinions by Guntharp. *Hanan*, 2020 WL 584370, at *4 ("For example, Mr. Guntharp concludes many times, using different words, that '[h]ad Mr. Knapp acted in a safe, professional manner, this crash would not have occurred.' . . . The Court will ask the jury—not a witness, even one who is an expert—to make such conclusions."). Further, as Defendant notes, "professional" is not a standard for Kansas drivers. Thus, it's not clear what purpose this opinion serves. Plaintiff alludes to Guntharp's expertise in commercial driving. To the extent this opinion was offered in the context of Defendant's employment with ONEOK, the Court has concluded that Ramage was not acting within the scope of his employment at the time of the accident. *See* Doc. 164. Accordingly, to the extent Guntharp is opining on Ramage's professionalism or on standards associated with commercial driving, those opinions are not relevant in this case and should be excluded.

Traffic Rules Opinion. Regarding the Traffic Rules Opinion, Defendant argue that it is an impermissible legal conclusion. Again, the Court agrees. As a preliminary matter, Guntharp's opinion that Defendant violated Kansas traffic rules is based on the same faulty and conclusory reasoning excluded above in the Causation Opinion. Beyond that, whether Defendant was negligent under Kansas law is the precise issue the jury will be asked to decide. *Jones*, 2015 WL 3620651, at *3 (excluding expert opinion that "squarely address the ultimate issue of whether [the other driver] was negligent in driving his vehicle . . . because they invade the province of the jury on questions that the jury is entirely capable of answering as the trier of fact"). Opinions on "whether certain conduct is 'legal' or 'authorized' under the law" is generally not proper. *In re Motor Fuel Temperature Sales Pracs. Litig.*, 2012 WL 3611010, at *2 (D. Kan. 2012).

Based on this analysis, the Court finds that Guntharp's testimony should be excluded in its entirety. Accordingly, the Court grants Defendant's motion to exclude as to Guntharp.

### B.   Krehbiel

Defendant seeks to exclude Krehbiel's videos and photographs to the extent he relies on them to show lighting conditions at the time of the accident because lighting conditions at sunset are common knowledge and because Krehbiel's opinions as to lighting are not reliable because he was not present at the accident and the conditions when he took the photos and video are not substantially similar to the time of the accident.[3]

To the extent Krehbiel simply wants to testify that, in his opinion, there was adequate lighting at the time of the accident, that testimony is not proper. As discussed above in the context of Guntharp's Conditions Opinion about the lighting at the time of the accident, that is not an issue that requires expert testimony. *See* Fed. R. Evid. 702(a). An ordinary juror does not need an expert

---

[3]   Defendant does not challenge Krehbiel's opinion that Sears's running lamps were on. Doc. 147 at 2 n.1.

to tell her how light it is at a certain time of day, absent any scientific testing measuring ambient lighting—something Krehbiel admitted he did not do. Beyond that, there are several fact witnesses who observed the conditions at the time of the accident first-hand and can testify to how light it was.

The question about whether Krehbiel may present his lighting recreation—in the form of video and photographs—to the jury is a separate question. As a preliminary matter, the parties dispute whether Krehbiel's video and photos demonstrating lighting conditions at the intersection are an attempt to reconstruct the accident or, as Plaintiff contends, are merely demonstrative evidence that illustrate certain scientific principles. This dispute matters because different standards apply depending on the type of evidence. Reconstructions or simulations are admissible if they are "made under conditions which are substantially similar to those which are the subject of the litigation." *Four Corners Helicopters, Inc. v. Turbomeca, S.A.*, 979 F.2d 1434, 1442 (10th Cir. 1992). But media not meant to depict the accident in question, and which only demonstrates mechanical principles, only need to be conducted under similar conditions. *Id.*; *see also S.V. v. Midwest Coast Transp., Inc.*, 2004 WL 3486464, at *2 (D. Kan. 2004) ("Regarding films or videos, the case law has long distinguished between films or videos which simulate actual events and those which simply illustrate mechanical principles."). The higher standard for recreations is due to the concern that recreations are significantly more likely to confuse the jury. *Altman v. Bobcat Co.*, 349 F. App'x 758, 763 (3d Cir. 2009).

A district court has wide discretion in determining the admissibility of experiments. *Gilbert v. Cosco Inc.*, 989 F.2d 399, 402 (10th Cir. 1993). In determining whether proposed evidence is a reconstruction or merely demonstrative, courts consider how close the media is to simulating the accident versus how much it simply demonstrates abstract scientific principles. *See id.*; *McKnight*

*By & Through Ludwig v. Johnson Controls, Inc.*, 36 F.3d 1396, 1402 (8th Cir. 1994). "The more blurred that distinction becomes, the greater the risk for prejudice." *Gilbert*, 989 F.2d at 403. Courts generally look to whether the media is sufficiently close in appearance to the original accident and whether it could create a risk of misunderstanding by the jury. *Jodoin v. Toyota Motor Corp.*, 284 F.3d 272, 278-79 (1st Cir. 2002). In such cases, the higher "substantially similar" standard applies. *Id.*

Here, the Court has reviewed the still photos in Krehbiel's report, Doc. 147-7 at 7-8, and the video provided, *see* Doc. 154.[4] The images were taken on December 21, 2019, at approximately 5:23 p.m.—almost exactly one year to the minute after the accident. Other images were taken on July 11, 2019, at approximately 9:02 p.m., which is just after sunset for that time year. They are taken from the driver's seat of a 2011 Ford F-250 positioned at the stop sign in the northbound lane of 28th Road—the vantage of Defendant right before the accident and in a similar vehicle.[5] A 1999 black Ford F-250—the same vehicle Sears was driving with Plaintiff as a passenger—was positioned in the westbound lane of Avenue J. The still images show the black truck approaching the intersection. The video reflects the black truck approaching and passing through the intersection. The still images are taken from the video.

On these facts, the Court concludes this video is a recreation of the accident scene and is therefore subject to the "substantially similar" standard. Although the video obviously does not depict the accident, the video recreates everything else. Instead of just documenting the approximate lighting of the time of the accident—something that could at least arguably fall under the lower standard that applies to media that simply illustrate mechanical or scientific principles,

---

[4]   Defendant states in his motion that there are many videos and photographs, but that the photos in Krehbiel's report and the video submitted to the Court are exemplars. Doc. 147 at 3 n.2.

[5]   Krehbiel's report states that a 2011 Ford F-250 exemplar was used. Defendant was driving a 2014 Ford F-250.

Krehbiel's videos and photographs go further and create images that are sufficiently close in appearance to the original accident. *See Four Corners Helicopters*, 979 F.2d at 1442. This resemblance is what crosses the line into the realm of reconstruction and gives rise to the requirement of substantial similarity. *Frederick v. Swift Transp. Co.*, 616 F.3d 1074, 1083 (10th Cir. 2010) ("However, Reed's proposed studies feature Reed behind the wheel of a tractor-trailer substantially similar to those involved in the accident and doing actions substantially similar to those that Swift's driver and the driver of the Yellow tractor-trailer did . . . . These studies clearly go beyond mere trucking safety or regulatory compliance and into the realm of accident reconstruction . . . ."); *see also Muth v. Ford Motor Co.*, 461 F.3d 557, 566-67 (5th Cir. 2006). Notably, it's not just lighting—as a scientific principle—depicted in the video, but also the visibility of the vehicles involved. Krehbiel testified as much, stating that the purpose of the video "was to document what the truck looked like as it approached the intersection, and also to document the lighting conditions at the time." Doc. 151-1 at 80. The Court also notes that Plaintiff often refers to Krehbiel's media as a reconstruction or recreation.[6]

Accordingly, Krehbiel's reconstruction must be shown to have been taken under conditions substantially similar to the accident to be admissible. *Four Corners Helicopters*, 979 F.2d at 1442. "Substantially similar" does not mean identical, but the conditions "must be sufficiently similar to provide a fair comparison." *Id.*; *see also Jodoin*, 284 F.3d at 279 (noting that the "substantial similarity" standard is not akin to "virtually identical"). The standard turns on the theory of the

---

[6]   *See* Doc. 151 at 2 (referring to "demonstrative evidence which seeks to reproduce to some extent the light conditions at the time of wreck"); 3 (noting that Plaintiff's attorneys asked Krehbiel to "us[e] data to recreate conditions as nearly identical as scientifically possible" and "to recreate the light conditions due to weather, time of day, and time of year"); 7 (stating that "Krehbiel returned on two different occasions to faithfully recreate the light conditions"); 9 ("Krehbiel did faithfully recreate the visibility . . .").

case and the specific variables alleged to have contributed to the accident. *See Jodoin*, 284 F.3d at 279-80.

Here, the parties primarily dispute whether Krehbiel's reconstruction was taken under similar weather conditions as existed the evening of the accident. Plaintiff contends that, while some evidence suggests it was cloudy or overcast, other evidence suggests it was not. Defendant has presented evidence that it was cloudy at the time of the accident. Defendant also points to other factors that call into question whether Krehbiel's reenactment is substantially similar to the actual accident. Doc. 157 at 5.

The Court shares Defendant's concerns about whether Krehbiel's reenactment is substantially similar to the accident. The Court is also concerned that the jury not be confused or misled. However, on the current record, the Court is unable to conclude whether Krehbiel's media is substantially similar enough to be admissible because there are disputed questions of fact about the circumstances of the accident. Accordingly, the Court will deny Defendant's motion without prejudice to refiling at trial. Krehbiel will not be permitted to testify about or present the media until after the Court is able to voir dire him about his reenactment and determine whether the circumstances of the reenactment were substantially similar to the accident.[7]

### C.    BiFulco

Defendant seeks to exclude the testimony of BiFulco, Plaintiff's life-care planner, as unreliable. Defendant does not challenge BiFulco's qualifications. Doc. 159 at 2. Defendant instead seeks to exclude BiFulco's report as unreliable for two reasons. First, BiFulco did not

---

[7]    As noted above, Defendant does not challenge Krehbiel's opinion that Sears's running lamps were on. Doc. 147 at 2 n.1. Accordingly, Krehbiel will be able to testify as to that opinion without restriction.

consider more recent medical records or testimony. Second, BiFulco's recommendations are not supported by or based on any recommendations by Plaintiff's treating physicians.

As a preliminary matter, it is not clear whether Plaintiff intends to seek damages for all the costs projected by BiFulco—something Defendant points out and Plaintiff does not address. BiFulco's report projects future medical expenses over the course of Plaintiff's life of $1,384,648.50, which includes $654,160 in home care/home services. Doc. 145-1 at 13. In the pretrial order, Plaintiff only seeks future medical expenses of $654,160—the amount projected by BiFulco just for home care/home services.[8] *See* Doc. 127 at 5. Thus, it is unclear whether Plaintiff has abandoned the other projected costs stated in BiFulco's report, or whether Plaintiff just seeks some amount of all the future expenses projected by BiFulco but in lesser amounts. Although it would have been helpful for Plaintiff to address this discrepancy in the briefing, the Court finds it unnecessary to reach this issue given its finding that BiFulco's opinions lack reliability.

BiFulco's report is dated April 22, 2019. Doc. 145-1 at 2. It states that he reviewed Plaintiff's medical records from December 21, 2018, through February 7, 2019, and that he obtained information directly from Plaintiff on March 28, 2019. *Id.* BiFulco's report states that his conclusions, medical cost projections, and recommendations are based on, in part, a comprehensive review of available medical records. *Id.* at 4.

Defendant first argues that BiFulco failed to consider some of Plaintiff's medical records from 2020, and that those medical records contradict some of BiFulco's recommendations. But questions about the sources of an expert's opinion go to the weight to be assigned to that opinion, rather than admissibility, and are for the trier of fact to determine. *Escalante v. LifePoint Hosp.*

---

[8]   The pretrial order also requests $757,841.97 (ongoing) in past medical expenses, $2 million in past non-economic loss, $2 million in future non-economic loss, $3,672 in current wage loss, and $3 million in future wage loss. Doc. 127 at 5-6.

*Inc.*, 2019 WL 2743910, at *5 (D. Kan. 2019). In other words, to the extent BiFulco did not consider more recent medical records, that is fodder for cross examination.

Defendant's second argument is that there is no basis for BiFulco's recommendations about the necessity or frequency of the services he recommends. On this point, the Court generally agrees. Plaintiff's response to Defendant's motion repeatedly asserts that BiFulco's contentions are based on and cite to specific recommendations of his treating physicians. *See, e.g.*, Doc. 152 at 2-3, 6, 8. But BiFulco's report does not reflect this. Rather, BiFulco's report relies on the medical record and on Plaintiff's statements to cite certain symptoms or diagnoses. He then cites to "clinical practice guidelines" to project future care needs—care needs that apparently do not vary for the next 62 years. *See* Doc. 145-1 at 8-11.[9] BiFulco then calculates future costs based on those projected future care needs. But with only a few exceptions, BiFulco cites nothing, other than "clinical practice guidelines," in support of what future care Plaintiff will actually need. These "clinical practice guidelines" fail to support BiFulco's recommendations, without something more. *See M.D.P. v. Middleton*, 925 F. Supp. 2d 1272, 1275-76 (M.D. Ala. 2013) ("Deutsch also looks at Clinical Practice Guidelines and recent research literature. . . . Deutsch explains in his deposition that he does not make medical recommendations, but pulls recommendations from medical records, or gets them from treating doctors."). Here, there is nothing more. This fails the reliability test under *Daubert*. *See Queen v. W.I.C., Inc.*, 2017 WL 3872180, at *4 (S.D. Ill. 2017) (excluding

---

[9]   For example, BiFulco notes that Plaintiff sustained a traumatic brain injury. "Clinical practice guidelines" recommend neurosurgery consultations and follow ups for evaluations, diagnostic studies, and further advanced management. Accordingly, BiFulco includes costs for two neurosurgery evaluations every year for the next 62.9 years (Plaintiff's life expectancy), at a total cost of $49,691. Doc. 145-1 at 8, 14. But other than the reference to "clinical practice guidelines," there is no suggestion that any of Plaintiff's doctors have ever recommended, or even suggested, that Plaintiff would need 125 neurosurgery evaluations over the course of his lifetime. And the only "clinical practice guidelines" cited in BiFulco's report are two websites, one which provides general information "About Traumatic Brain Injury," and another that explains generally what neurologists do. *See id.* at 7. Neither supports a recommendation that Plaintiff will require two neurosurgery evaluations every year for the rest of his life. The same is true for the other websites cited by BiFulco. *See id.*

BiFulco's life-care plan because "BiFulco's report sets forth recommendations that are unsupported by the medical records generated by Queen's treating physicians, and BiFulco fails to explain the basis for his additional treatment recommendations and valuations").

Although not binding, the Court finds the decision in *Queen* persuasive. There, BiFulco submitted a life-care plan for the plaintiff based on a review of the medical records and an examination of the plaintiff. *Id.* at *4. Although the court found him to be qualified, *id.* at *3, it concluded his methodology and reasoning were "<u>not</u> based on more than subjective belief and unsupported speculation," *id.* at *4 (emphasis in original). This was, in part, because BiFulco relied on his own assessment of the plaintiff, not on the assessment of his treating physicians. *Id.* The court went on to note

> Dr. BiFulco's recommended care plan suggests multiple treatments that are neither supported by Queen's medical records, nor recommended by Queen's treating physicians. Dr. BiFulco's report and his deposition testimony fail to provide insight into the methods by which BiFulco reached the conclusions that Queen required extensive physical therapy, massage therapy, mechanical traction, intersegmental traction, electrical stimulation, muscle stimulation, ultrasound, trigger point injections, steroid injections, and anesthetic blocks. None of Queen's treating physicians recommended those proposed treatments; Dr. BiFulco never ordered any additional diagnostic tests; Dr. BiFulco never spoke to Queen after that initial examination; he never spoke to any of Queen's family members; and he never spoke to Queen's treating physicians[.]

*Id.* Because BiFulco offered no basis for his opinion and failed to explain his methodologies, his conclusions were excluded as improper ipse dixit. *Id.* at *5.

The Court does not dispute on a general level that life-care planners may be qualified to testify to a patient's future care needs and the costs of that care. *See M.D.P.*, 925 F. Supp. 2d at 1275. In many cases, those recommendations come from a patient's doctors. *See Watson v. Taylor*, 2006 WL 8440590, at *4 (D. Kan. 2006) ("Plaintiff argues that Patrick Griffith, M.D., one of her

treating physicians, already has provided an appropriate foundation for all of the future life care needs outlined in Ms. Allison's report and referenced in Professor Ward's report."); *O'Shea v. Welch*, 2002 WL 1974046, at *2 (D. Kan. 2002) ("Tracy Wingate, a qualified expert life care planner, testified that she discussed and confirmed the future medical needs of plaintiff through communications with Dr. Burton."); *Snider v. New Hampshire Ins. Co.*, 2016 WL 3193473, at *2 (E.D. La. 2016) ("[T]his Court allows life care planners to testify as to future healthcare needs, predicated upon the testimony of treating physicians as to the reasonable need for such care, and the cost of such care."). It's not enough to base future care needs on speculation. *See State Farm Fire & Cas. Co. v. Bell*, 30 F. Supp. 3d 1085, 1109 (D. Kan. 2014) (allowing certain testimony but excluding other recommendations where "[t]he record provides no reliable evidence to support Lampton's opinion that plaintiff will require these procedures in the future").

The only specific recommendations of Plaintiff's doctors referenced in BiFulco's report are that, as of February 2019, he was recommended to use a sling for his right shoulder, Doc. 145-1 at 8, and that a doctor recommended an MRI of his neck and brachial plexus, and an EMG study of his upper extremity, *id.* at 10. BiFulco appropriately includes one-time future costs for the MRI of Plaintiff's neck and brachial plexus and the EMG of his upper extremity, *id.* at 17. But BiFulco takes the sling recommendation, along with a description of Plaintiff's shoulder injury and recommends two orthopedic evaluations each year for the rest of Plaintiff's life, *id.* at 14, even though the only recommendation of Plaintiff's doctor was that he wear a sling in 2019. Like BiFulco's recommendation based only on "clinical practice guidelines," this is far too speculative.

Finally, Plaintiff argues that even if BiFulco's report is not based on physician recommendations, it would still be admissible because some courts have found that there is no requirement that a life-care planner consult with treating physicians before formulating a life-care

plan, especially where the life-care planner is a medical professional, as BiFulco is. *See* Doc. 152 at 12. The Court acknowledges that there are divergent views on whether a life-care planner must consult with treating physicians. *See Durr v. GOL, LLC*, 2019 WL 6464971, at *4 (E.D. La. 2019) (citing cases). But here, not only did BiFulco not rely on recommendations of Plaintiff's treating physicians, the Court is unable discern any methodology he relied on to conclude that Plaintiff requires such extensive care for the rest of his life, other than reciting various injuries he had in 2018 and 2019. Nor is the fact that BiFulco is a medical professional sufficient, standing alone, especially where his report does not indicate that any of his opinions are based on his experience and training. *See Queen*, 2017 WL 3872180, at *5 ("Here, BiFulco is a licensed physiatrist without any orthopedic expertise. Given that plaintiff failed to establish a standard for a physiatrist to offer these opinions, the Court finds that BiFulco's opinion is not reliable and not based on proper methodology.").

Accordingly, the Court concludes that BiFulco's projections about Plaintiff's future medical needs are not reliable and must be excluded. Because BiFulco's cost estimates are based on those needs, the cost estimates must also be excluded. The only exception is BiFulco's projections regarding an MRI of Plaintiff's neck and brachial plexus, and an EMG of his upper extremity. BiFulco may testify about that recommendation and the associated projected future costs (in the amount of $2,550.00).

### D.    Tremp

Finally, Tremp has offered opinions about Plaintiff's future vocational abilities. Defendant does not challenge Tremp's qualifications in the field of vocational rehabilitation. Doc. 138 at 15. Instead, Defendant argues that Tremp's opinions lack factual foundation, are not based on any discernible methodology, and are speculative.

Regarding the factual foundation for Tremp's opinion, Defendant again points to facts in the record that contradict facts and assumptions made by Tremp. But as explained above, questions about the sources of an expert's opinion go to the weight to be assigned to that opinion—rather than admissibility—and are for the trier of fact to determine. *Escalante*, 2019 WL 2743910, at *5. Having reviewed Defendant's four *Daubert* motions, the Court is well aware that Defendant emphatically disputes the characterization of Plaintiff's current condition, based on his more recent medical records and other testimony in the case. But the Court is confident that Tremp's opinion on this score can be tested by vigorous cross examination.[10]

Defendant also seeks to exclude Tremp's testimony because his methodology is "non-existent" and his opinions are impermissible ipse dixit. The Court disagrees. Tremp's report states that his methodology is based on the RAPEL method, which "assesses relevant factors for determining vocational damages (if any)." Doc. 144-1 at 3. The report states that "RAPEL is a standardized methodology that is commonly used by vocational rehabilitation professionals" and "has been peer reviewed numerous times and is a widely accepted methodology within the field of Vocational Rehabilitation." *Id.* According to Tremp's report, the RAPEL method is based on consideration of five factors. *Id.* at 3-4.

Defendant does not challenge the validity of the RAPEL method, which other courts have recognized as valid. *See Morgan v. Jacques*, 2010 WL 11537864, at *3 (D. Vt. 2010). Rather, Defendant contends that Tremp cites this method but then "does nothing to explain how those factors lead to his opinions." Doc. 138 at 12. Although the Court agrees that Tremp's report could

---

[10] The Court does note Defendant's argument that Tremp reviewed BiFulco's report. *See* Doc. 144-1 at 4. BiFulco's report has, in large part, been excluded by this order. To the extent Tremp relied on BiFulco's recommendations in reaching his own conclusions, those conclusions would now be without support. But it is unclear which of Tremp's conclusions are based on BiFulco's report, as Tremp also reviewed Plaintiff's medical records and another expert report, and he interviewed Plaintiff. Accordingly, although the Court denies Defendant's motion as to Tremp, the denial will be without prejudice to the extent Tremp relied on BiFulco's findings.

go a little further at connecting the dots, it does not agree that he abandons the RAPEL factors altogether.

Tremp's report states that the RAPEL method considers five factors: (1) rehabilitation plan, (2) access to the labor market, (3) placeability, (4) earning capacity, and (5) labor force participation. Doc. 144-1 at 4. After listing Plaintiff's background, impairments, and employment and educational background, Tremp opines on Plaintiff's post-injury vocational capacity. In doing so, he considered Plaintiff's transferable skills, his access to the labor market, accommodations and placeability, his labor force participation, and his earning capacity. *Id.* at 6-8. These factors largely match up with the RAPEL factors he listed. *See Morgan*, 2010 WL 11537864, at *3 (allowing for slight modification to the RAPEL methodology, noting testimony that it requires a "considerable amount of discretion in its application"). In considering these factors, Tremp tied them to Plaintiff's condition and offered his opinion that his conditions will limit his access to vocational opportunities, will cause him to require accommodations that can limit employers' willingness to hire him, that his conditions will reduce his ability to participate in the labor force, and that his earning capacity will be limited as a result. Doc. 144-1 at 6-9. Based on this, the Court cannot say his methodology is non-existent.

Finally, Defendant claims Tremp's conclusions are speculative. But much of this argument involves pointing to facts in the record that Defendant believes run counter to Tremp's conclusions. *See* Doc. 138 at 14. Again, the Court is confident that Defendant will be able to address these concerns on cross examination.

## IV.   CONCLUSION

The Court considered each motion. For the reasons discussed above, the Court grants Defendant's motion as to Guntharp, denies without prejudice Defendant's motion as to Krehbiel,

grants Defendant's motion as to BiFulco with a limited exception, and denies Defendant's motion as to Tremp.

THE COURT THEREFORE ORDERS that Defendant's motion to exclude Guntharp's testimony (Doc. 139) is GRANTED.

THE COURT FURTHER ORDERS that Defendant's motion to exclude Krehbiel's testimony about his reconstruction (Doc. 146) is DENIED WITHOUT PREJUDICE. Defendant may reassert this motion at trial so that the Court can evaluate whether Krehbiel's reconstruction is substantially similar to the accident.

THE COURT FURTHER ORDERS that Defendant's motion to exclude BiFulco's testimony (Doc. 141) is GRANTED except as to BiFulco's projection about Plaintiff's recommended MRI and EMG.

THE COURT FURTHER ORDERS that Defendant's motion to exclude Tremp's testimony (Doc. 136) is DENIED.

IT IS SO ORDERED.

Dated: June 3, 2021                     /s/ *Holly L. Teeter*_____
                                        HOLLY L. TEETER
                                        UNITED STATES DISTRICT JUDGE